Joseph E. BRENNAN, Attorney General

v.

SACO CONSTRUCTION, INC., Pinegrove
Corp., Sherwood Development Corp.,
and Leroy I. Waycott.

Supreme Judicial Court of Maine.

Jan. 12, 1978.

John M. R. Paterson (orally) Lee M. Schepps, Asst. Attys. Gen., Augusta, for plaintiff.

Bernstein, Shur, Sawyer & Nelson by F. Paul Frinsko, Portland (orally), Smith, Elliott, Wood & Nelson, P.A. by Roger S. Elliott, Saco, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE,* POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Active Retired Justice.[1]

In July, 1973 the plaintiffs, the Attorney General of the State of Maine and the Board of Environmental Protection, instituted this action in the Superior Court of York County against the defendants, Leroy I. Waycott, Saco Construction, Inc., Pine-

* Mr. Justice Weatherbee sat at argument and participated in consultation but died prior to preparation of opinion.

1. Mr. Justice Dufresne sat at argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered and

grove Corporation and Sherwood Development Corporation.[2]

In their complaint, the plaintiffs allege that the defendants have been engaged in the development of three residential subdivisions located in the City of Saco and known as Hillview Heights Section 2 (HH2), Pinegrove and Sherwood, without the approval of the Board of Environmental Protection which they claim was required by the Site Location of Development Law (Site Location Law), 38 M.R.S.A. §§ 481–488 (Supp.1973). The plaintiffs prayed that the Court enjoin the defendants from any further development of the three subdivisions until they obtained the Board's approval.

Finding that the developments were subject to regulation under the Site Location Law,[3] the presiding Justice issued the injunction, as prayed for, in a decree dated June 4, 1975. The defendants have appealed to this Court. We deny the appeal.

The issue on appeal is, whether Hillview Heights Section 2, Pinegrove and Sherwood are subject to the provisions of 38 M.R.S.A. §§ 481–488 (Supp.1973).

### I. Hillview Heights Section 2

In May, 1968 Leroy Waycott and his wife, Noreen, purchased a 63-acre tract of land in Saco, Maine. Shortly thereafter, the Waycotts secured a preliminary survey of the property and hired an engineer to design and plan a residential development that would eventually accommodate 105 new homes. In July of the same year, Leroy Waycott submitted a preliminary plan of the proposed development, which he designated Hillview Heights, to the Saco Planning Board. Acting pursuant to the subdi-

vision regulations of the municipality, the planning board, on August 6, 1968, granted a conditional approval of the preliminary plan of Hillview Heights then before the board.

Subsequent to this conditional approval, Leroy Waycott divided Hillview Heights into two segments, one of 8 acres in area entitled Hillview Heights Section 1 (HH1), and the other named Hillview Heights Section 2 (HH2) which comprised 55 acres. Waycott obtained the planning board's final approval for HH1 and recorded the plan in the York County Registry of Deeds in September, 1968. The developer began constructing new homes on HH1 without delay.

In contrast to Hillview Heights Section 1, Waycott proceeded to develop Hillview Heights Section 2 at a much slower pace. During the summer and fall of 1969, he cleared an unpaved road into HH2 for a length of 400 feet, installed a water main into the subdivision for an unspecified distance, and erected a utility pole on the border of the property. Waycott also installed water mains on HH1 of sufficient capacity to accommodate the homes that he anticipated building on HH2. He did not, however, initiate construction of new homes on Hillview Heights Section 2 prior to January 1, 1970, and, in fact, did not apply for and obtain the Saco Planning Board's final approval for that development until the spring of 1971.

Prior thereto, on September 5, 1969 Leroy and Noreen Waycott had formed Saco Construction, Inc. pursuant to the laws of Maine. They sold their entire 63-acre tract of land to the corporation, which later carried out the development of Hillview Heights Section 2, completing in some in-

authorized to continue his participation in the case in his capacity of Active Retired Justice.

2. On January 8, 1974, the Superior Court Justice granted the defendant Waycott's motion to dismiss the complaint as to him individually.

3. In *State v. R. D. Realty Corporation*, Me., 349 A.2d 201 (1975), this Court held that the question, whether a development is subject to the Site Location Law, should generally be resolved by the tribunal charged with the admin-

istration of the statute before judicial relief may be invoked. We note that in the present case the Board of Environmental Protection has not had occasion to determine whether the three subdivisions are subject to the Site Location Law. However, as our decision in *R. D. Realty* was specifically limited to all cases arising subsequent to the date of our opinion, i. e. subsequent to December 18, 1975, we proceed with the merits of this case.

stances, or initiating construction of, 37 new homes in HH2 by the time of the institution of this suit.

The defendants contend that Hillview Heights Section 2 is exempt from the operation of the Site Location Law by virtue of 38 M.R.S.A. § 488 (Supp.1973). Section 488 provides, in pertinent part, that the Site Location Law

"shall not apply to any development in existence or in possession of applicable state or local licenses to operate or under construction on January 1, 1970, . . ."

■ In determining whether the Hillview Heights Section 2 project comes within the exempted developments enumerated in this section of the Site Location Law, we recognize that the statutory exemption provision should be strictly construed in favor of the defendants. See *King Resources Company v. Environmental Improvement Commission,* Me., 270 A.2d 863, 869 (1970).

### A. Single Development

The defendants' first argument is that Hillview Heights Section 1 and Hillview Heights Section 2 constitute a single development within the meaning of the Site Location Law. All parties to this controversy agree that HH1 is exempt from regulation under the statute, as that part of the development was unquestionably in existence, in possession of applicable licenses to operate, or under construction on January 1, 1970. The defendants contend that HH2 also must be viewed as exempt under section 488, because of its integrated connection with HH1.

■ However, after hearing the evidence and passing upon the credibility of the witnesses and the persuasiveness vel non of the exhibits, the presiding Justice rejected the defendants' argument and held that Hillview Heights Sections 1 and 2 constituted separate and distinct developments. Such findings of fact at the trial level will be affirmed on appeal, unless shown to be clearly erroneous. See *Boynton v. Adams,* Me., 331 A.2d 370 (1975); *Leighton v. Leighton,* Me., 329 A.2d 164 (1974); *McKen-*

*na v. Peddle Land Developments,* Me., 229 A.2d 332 (1967); Rule 52(a), M.R.Civ.P.

Tested against this standard, the defendants' argument is without merit. The fact that Leroy Waycott obtained the planning board's preliminary approval for the entire 63-acre tract indicates that he may originally have conceived of Hillview Heights as a single development. The trial Justice, however, was justified in concluding that, when Waycott later divided the tract into two separate segments and in 1968 obtained final planning board approval, and proceeded with the development, of only Hillview Heights Section 1, the original unitary concept of the development had been abandoned. In fact, application for final planning board approval of HH2 was not made until over two years later. We cannot say that the presiding Justice was clearly wrong in deciding from the totality of the evidence that Waycott chose to develop the property in two separate developments. We hold that Hillview Heights Section 2 is not exempt from the Site Location Law on the basis of a unitary development with Hillview Heights Section 1.

### B. Existence of Hillview Heights Section 2 Development on January 1, 1970

■ The defendants maintain that, even if viewed as a separate development, Hillview Heights Section 2 was "in existence" on January 1, 1970 and within the statutory exemption provided in section 488 of the Site Location Law.

In *King Resources Co. v. Environmental Improvement Commission,* supra, we said that an existing development parallels an existing use and should mean "the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose." Id. at 869. Applying this concept to the present case, we find that Hillview Heights Section 2 could not possibly have been known in the area as being employed for residential purposes on January 1, 1970. Aside from the clearing of an unpaved road and some minor utility work, HH2 existed essentially in

an undeveloped state and was merely contemplated as a residential development on that date. As we stated in *King Resources,* a "mere contemplated or intended use" is insufficient to give rise to an existing development within the meaning of section 488. Id. at 869.

### C. Licensed Development on January 1, 1970

■ Also exempt from the Site Location Law are developments "in possession of applicable state or local licenses to operate" on January 1, 1970. The defendants concede that HH2 did not possess the Saco Planning Board's final approval, as required by the subdivision regulations of the municipality, until May, 1971. They argue, however, that the planning board gave its preliminary approval subject to certain conditions to the original Hillview Heights area in 1968, and that, once these conditions were satisfied prior to January 1, 1970, the defendants as developers of Hillview Heights Section 2 became entitled to the planning board's final approval as a matter of law. The defendants apparently contend that this alleged right to planning board approval relates back to the original preliminary approval. We disagree.

The defendants' argument ignores the plain wording of the exemption. The exemption applies to developments *in possession* of applicable licenses to operate, not to those that merely have a *right* to receive the licenses. Therefore, even if Hillview Heights Section 2 was legally entitled to final planning board approval prior to January 1, 1970, it did not possess the license until well after that date, and is not entitled to the exemption on the reference basis.

### D. Development under construction on January 1, 1970

■ The defendants' final claim to exemption under section 488 in relation to Hillview Heights Section 2 is that the development was "under construction" on January 1, 1970. In enacting this particular statutory provision, the Legislature neglect-

ed to qualify the extent of activity required for a development to be "under construction." We believe, however, that a developer must expend a substantial amount of money or effort towards the completion of a development before the project is entitled to an exemption. The test of substantiality, moreover, involves an assessment of the amount of money or effort expended in relation to the amount required to complete the development. *Aries Development Co. v. California Coastal Zone Cons. Com'n,* 48 Cal.App.3d 534, 122 Cal.Rptr. 315 (1975); *Gosselin v. City of Nashua,* 114 N.H. 447, 321 A.2d 593 (1974); *Edelbeck v. Town of Theresa,* 57 Wis.2d 172, 203 N.W.2d 694 (1973); *Hempstead v. Lynne,* 32 Misc.2d 312, 222 N.Y.S.2d 526 (1961).

■ In the present case, the president of Saco Construction, Inc. testified that the ultimate development costs of Hillview Heights Section 2 would be between $1,500,000 and $4,000,000. The record fails to reveal the amount of money expended for the road and utility work which had occurred on HH2 as of January 1, 1970. We believe, however, that the money spent on these minor construction efforts was clearly insubstantial in relation to the anticipated costs of the residential development.

The defendants assert, however, that the extent of construction involved in the present proceedings is similar to that of the recent case of *State v. R. D. Realty Corp.,* Me., 349 A.2d 201 (1975). In that case, a developer cleared five miles of rough roads and constructed a cottage and a small airplane landing strip on a residential subdivision. We held in *R. D. Realty* that these development efforts constituted sufficient construction to warrant an exemption under § 488.

Assuming that the level of construction achieved in Hillview Heights Section 2 on January 1, 1970 is equal to that of *R. D. Realty,* we, nevertheless, believe that the facts of that case are not controlling. The developer in *R. D. Realty* intended merely to sell vacant lots to the public. In contrast, the developer in the present case embarked upon a much more costly undertak-

ing: the construction of approximately 80 homes equipped with utilities and paved roads. Saco Construction, Inc. would accordingly have to expend a greater construction effort than the subdivider in *R. D. Realty* before Hillview Heights Section 2 could be considered to be "under construction" within the meaning of the Site Location Law.

We hold, therefore, that Hillview Heights Section 2 is not exempt from regulation under the Site Location Law, and that there was no error in the ruling of the Superior Court Justice to that effect.

## II. Pinegrove and Sherwood Developments

Leroy Waycott has served as president of Saco Construction, Inc. from the formation of the corporation to the present time. His wife, Noreen, was the sole stockholder of the corporation from September 11, 1969 until October 12, 1971. On the latter date, Leroy Waycott became the majority and controlling stockholder of Saco Construction, Inc., with his wife retaining the remaining shares.

On October 16, 1970, Saco Construction, Inc. purchased a 30-acre tract of land adjoining Hillview Heights Sections 1 and 2. The corporation subsequently divided the parcel into two 15-acre subdivisions entitled Pinegrove and Sherwood respectively. The plans for these subdivisions were given final approval by the Saco Planning Board and recorded in the York County Registry of Deeds in May, 1971.

In the spring of 1971, Leroy Waycott formed two new corporations: Pinegrove Corporation and Sherwood Development Corporation. Saco Construction, Inc. then sold Pinegrove to the Pinegrove Corporation in exchange for 120 shares of its stock, and deeded Sherwood to Sherwood Development Corporation for 80 shares of its stock. As a result of these transactions, Saco Construction, Inc. became the controlling stockholder in these two newly-formed corporations. Since the formation of Pinegrove Corporation and Sherwood Development Corporation, Leroy Waycott has been the president and sole employee of both corporations.

In spite of the conveyances of Pinegrove and Sherwood, Saco Construction, Inc. has remained the moving force in the development of the two 15-acre subdivisions. Pinegrove Corporation's only role in the development of Pinegrove has been to resell individual lots back to Saco Construction, Inc. The parent corporation would then assume exclusive responsibility for the construction of houses upon the lots, and for the eventual sale of the completed residences to the public. Pursuant to this arrangement, Saco Construction, Inc. has either completed or initiated the building of 17 new residences in Pinegrove. Although actual construction has not yet occurred on Sherwood, the defendants intended at the time of the formation of the Sherwood Development Corporation to employ a similar procedure for the development of that subdivision.

The provisions of the Site Location Law apply to developments which may substantially affect the local environment, which the statute defines, in pertinent part, as any "commercial or industrial development, including subdivisions, . . . which occupies a land or water area in excess of 20 acres . . . ." 38 M.R.S.A. § 482(2) (Supp.1973). The defendants argue that, since Pinegrove and Sherwood each contain less than 20 acres of land owned by two separate and distinct corporations, the subdivisions are not subject to regulation under the statute. In response to the defendants' argument, the plaintiffs contend *inter alia* that the two subsidiary corporations were created for the purpose of circumventing the statute. The plaintiffs do urge this Court to disregard the separate identities of Pinegrove Corporation and Sherwood Development Corporation, and treat the two 15-acre subdivisions as a single development within the meaning of the Site Location Law.

■ The underlying purpose of the Site Location Law is to control and regulate the location of fairly large land subdivisions and developments to minimize adverse envi-

ronmental impacts which may result from the selection, for such subdivisions and developments, of land areas not suitable for the same without exposing the environment, and in consequence the public, to serious injury. *In re Belgrade Shores, Inc.,* Me., 371 A.2d 413 (1977); *In re Spring Valley Development,* Me., 300 A.2d 736 (1973).

As stated in *In re Spring Valley Development,* supra, at 752:

"The purpose, as we have said, was to control the locations of those commercial and industrial developments which could substantially adversely affect the environment. The Legislature evidently concluded that the size of a development has a distinct relationship to the amount of its potential adverse impact upon the environment and concluded that at this time the public interest could best be served by applying the admittedly severe restrictions of the new law to large developments."

Since the Site Location Law is directed toward the regulation and control under the Board of Environmental Protection of land areas *in excess of 20 acres* to be used in commercial or industrial subdivisions or developments for the purpose of minimizing the likely adverse impact such projects may have on the environment, the defendants' deliberate choice to divide the single tract purchase into two distinct programs, labelled Pinegrove and Sherwood, gave rise to the plaintiffs' claim that this preliminary dissection of the area into two equal plots under the 20 acre restriction was but an ingenious attempt to avoid and evade the law.

■ We recognize that courts have been reluctant to disregard the legal entity of corporations and will do so with caution and only when necessary in the interest of justice. See *Bonnar-Vawter v. Johnson,* 157 Me. 380, 173 A.2d 141 (1961); *Maine Aviation Corporation v. Johnson,* 160 Me. 1, 196 A.2d 748 (1964).

It is well settled, however, that a court will disregard the fiction of a corporation's separate identity whenever the concept is asserted in an endeavor to circumvent a statute and defeat legislative policy. See *Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974); *People ex rel. Brown v. Illinois State Troop L. No. 41,* 7 Ill.App.3d 98, 286 N.E.2d 524 (1972); *Kavanaugh v. Ford Motor Company,* 353 F.2d 710 (7th Cir. 1965); *Anderson v. Abbott,* 321 U.S. 349, 362, 363, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944); *Metropolitan Holding Co. v. Snyder,* 79 F.2d 263 (8th Cir. 1935).

Responding to the above line of cases, the defendants argue that Leroy Waycott did not form the two subsidiary corporations with the intention of circumventing the Site Location Law. Rather, the defendants allege that this particular corporate format was adopted in order to minimize financial risk, to protect corporate property from a New Hampshire suit pending against Leroy Waycott, and to create a more advantageous pension and profit sharing plan.

■ We need not decide, however, whether the intention of the incorporators is a controlling element in such cases. True, the United States Supreme Court stated in *Anderson v. Abbott,* supra 321 U.S. at page 363, 64 S.Ct. at page 538, that the "interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement." *Accord; Casanova Guns, Inc. v. Connally,* 454 F.2d 1320, 1323 n.2 (7th Cir. 1972). But see *People ex rel. Brown v. Illinois State Troop. L. No. 41,* supra. The interposition of the corporate structure employed in the present case would exempt Pinegrove and Sherwood from the operation of the Site Location Law, thereby defeating the legislative policy that developments in excess of 20 acres should be subject to regulation under the statute.

In the instant case, the presiding Justice rejected the defendants' allegation of a lack of intent to circumvent the statute, finding, as he did, as follows:

"The facts of this case lead irresistably to the conclusion that a substantial moti-

vation for dividing the 30-acre tract into two 15-acre subdivisions each owned by a separate corporation, with each of the separate corporations being a subsidiary of the same parent corporation, and the entire corporate structure under the control of a single individual was to avoid and evade regulation under the Site Selection Law."

We cannot say that this finding of fact is clearly erroneous. The formation of the two subsidiary corporations occurred well after the enactment of 38 M.R.S.A. §§ 481–488 (Supp.1973), which suggests that the corporate format was adopted for the purpose of avoiding the statute. The fact that Pinegrove Corporation and Sherwood Development Corporation have no real function other than to hold and supply lots to Saco Construction, Inc. makes this suggestion compelling, especially in view of the defendants' failure to explain why the other alleged business purposes for forming the two corporations could not have been satisfied by the creation of a single subsidiary corporation.

Under the circumstances, the decision below must stand on appeal.

The entry will be

Appeal denied.

Judgment affirmed.

POMEROY, WERNICK and ARCHIBALD, JJ., concur.

DELAHANTY, J., did not sit.