581 So.2d 193 (1991)
DEPARTMENT OF NATURAL RESOURCES, Appellant,
v.
WINGFIELD DEVELOPMENT COMPANY, Appellee.
No. 89-1303.
District Court of Appeal of Florida, First District.
May 28, 1991.
Rehearing Denied July 16, 1991.
*194 Kenneth J. Plante, Gen. Counsel, Margaret S. Karniewicz & Dana M. Wiehle, Asst. Gen. Counsel, Tallahassee, for appellant.
Richard S. Brightman, of Hopping, Boyd, Green & Sams, Tallahassee, for appellee.
PER CURIAM.
The Department of Natural Resources (DNR) appeals a final order which held that DNR's rule requiring Wingfield Development Company (Wingfield) to submit a "build out" schedule and to complete the project within two years is an illicit rule and that Fla. Admin. Code Rule 16B-33.002(56), is an invalid exercise of delegated legislative authority. DNR contends that the hearing officer erred in invalidating the entire definition of the term "under construction" contained in Rule 16B-33.002(56), and that he erred in determining that DNR lacks statutory authority to require continuous construction in order for a structure to be exempt from the coastal construction control line (CCCL) permit requirements. We affirm.
In early 1983, Wingfield began to develop a resort project on land it owned in Indian River County. When completed, the project will consist of a 256-unit hotel, 68 villas, two swimming pools, cabanas, and other amenities. All of the structures were designed to be constructed landward of the then-existing coastal construction control line. The cost of the entire project was expected to be approximately $50 million. From 1983 until 1987, Wingfield spent approximately $1.4 million on the project.
On March 5, 1987, DNR relocated the CCCL by moving the line further inland resulting in several portions of the Wingfield project being now seaward of the new CCCL. In November of 1987, the Indian River County Building Department ordered Wingfield to cease construction activities. On April 4, 1988, DNR advised Wingfield via letter that it had determined the following:
The foundations for the hotel structure and the cabana located in the southeast portion of the property were "under construction" pursuant to the definition contained in Subsection 16B-33.002(56), Florida Administrative Code, at the time of the reestablishment of the coastal construction control line on March 4, 1987, ... [and that] the remaining five proposed cabana structures located on the south half of the property and shown to be seaward of the new control line, the proposed swimming pools, decks and gazebos, parking areas also shown to be seaward of the new control line and any other proposed landscaping work not "under construction" pursuant to the definition.
.....
A proposed "build out" schedule [that] would entail providing [the] staff with specifics of where [petitioner] expect[s] the overall project to be at ninety (90) day intervals up through completion of the structures located seaward of the coastal construction line. The staff feels that two years should be more than ample time with which to complete that portion of the project located seaward of the coastal construction control line. Progress must be maintained on each structure during each six month interval. Additionally, should your project fall short of any ninety day progress levels to be references in your "build out" plan, *195 your project will lose it's (sic) exemption status and all remaining portions of the project, seaward of the control line will require a permit from the (DNR) in accordance with the provisions of Section 161.053, Florida Statutes.
Wingfield then requested a § 120.57(1), Fla. Stat., hearing while at the same time continuing construction on the project. DNR informed Wingfield on November 25, 1988, that the project had lost its exempt status, and that any further construction activity seaward of the CCCL would require a permit from DNR. Wingfield filed a second request for hearing seeking to invalidate Fla. Admin. Code Rules 16B-33.002(56) and 16B-33.004(1) from which the statements in the letter were drawn. A formal hearing was conducted on March 6, 1989. At the final hearing, the hearing officer heard testimony from Gordon S. Nutt, owner and president of Wingfield; Kirby B. Green, III, Director of DNR's Division of Beaches and Shores; Eric J. Olsen, an expert in coastal engineering; and Neal A. Rodgers, Jr., a DNR engineer.
The definition of "under construction" in Rule 16B-33.002(56) sets forth those preconstruction activities which DNR does not consider to be sufficient activity to exempt a structure from coastal permit requirements:
"Under construction" is the continuous physical activity of placing the foundation or continuation of construction above the foundation of any structure seaward of the established coastal construction or setback line. "Under construction" does not include application for or obtaining a building permit, a site plan approval or zoning approval from the appropriate local government agency having jurisdiction over the activity, purchasing construction materials, placing such construction materials on the site, clearing or grading the site in anticipation of construction, site surveying, continuation of site work landscape work or construction of nonhabitable major structures or rigid coastal off shore protection structures, or reactivating construction after substantially all construction activity has remained stopped for a period of six months or more.
DNR relies on this rule and interprets its language to mean that construction must be continuous and without cessation of activities for more than six months. This rule's language is premised on § 161.053(9), Fla. Stat., which reads in pertinent part:
The provisions of this section do not apply to ... structures existing or under construction prior to the establishment of a coastal construction control line as provided herein, provided such structures may not be materially altered except as provided in subsection (5).
(Emphasis added.)
Wingfield argued that DNR's requirements that once a project is given an exempt status it must remain under active construction, and that the owner must submit for DNR's approval a "build out" schedule, constitute an illicit rule as such requirements are not contained in DNR's rules. DNR contends that under § 161.053, no construction activity may take place seaward of the CCCL without a permit, and that any projects which are under construction at the time a new CCCL is established are exempt from such permitting requirements. DNR further requires that an exempt project remain under active construction once it receives exempt status. It mandates the above requirement to insure the exemption status was obtained in good faith and that the builder intends to go forward with the construction in a timely manner. In order to guarantee that a developer does not engage in minimal construction efforts, DNR has imposed a requirement that if construction activity ceases for a period of six months or more, the exempt status will be lost. This policy has been uniformly applied on all projects classified as exempt. Additionally, DNR has required project owners to submit a "build out" schedule to DNR at 90-day intervals containing a construction schedule setting forth a time certain for the completion of the project.
DNR concedes that there is no specific statutory language authorizing the above *196 requirements. Nevertheless, it takes the position that the requirements are authorized and sanctioned by Chapter 161, Fla. Stat., and more specifically § 161.053, and by Rule 16B-33.002(56) and Rule 16B-33.004(1). Rule 16B-33.004(1) provides:
Any structures under construction prior to the establishment of a coastal construction control line in a particular county are exempt from the provisions of Section 161.053, Florida Statutes, and this Chapter, except as noted in Subsection 161.053(12), Florida Statutes.
DNR acknowledges that there is nothing in Rule 16B-33.004(1) that specifically authorizes it to impose the challenged requirements. It does, however, rely upon § 161.053(12), which removes the exempt status of a project if there are any subsequent modifications which "require, involve, or include any additions to, or repair or modification of, the existing foundation of that structure," as authority for it to make a determination whether the project owner has made any substantial change in the nature of the project if the construction has been continuous.
Finally, DNR relies upon § 161.053(1)(a) which sets forth the legislative intent behind the establishment of the CCCL. This portion of the statute states that the purpose of a CCCL is to protect the beaches and dunes from imprudent construction which can "provide inadequate protection to upland structures." DNR interprets this language to mean that it has the authority to "go back and look at projects once they are declared exempt and to make sure that they remain exempt under the statute."
A final order was entered which held that DNR's requirement to submit a "build out" schedule and to complete the project within two years constitutes an illicit rule, and further that Rule 16B-33.002(56) was an invalid exercise of delegated legislative authority. Rule 16B-33.004(1) was found to be a valid exercise of delegated legislative authority. DNR filed this appeal.
Contrary to DNR's contention, the hearing officer correctly ruled that DNR lacked the authority to compel Wingfield to comply with the limitations, requirements and provisions contained in the letter written to Wingfield on April 4, 1988, including the requirement of a "build out" schedule with progress reports at 90-day intervals up through the completion of the structures located seaward of the revised coastal construction line, and all other timing provisions in the letters that would result in the loss of its exempt status. The letters constitute an illicit rule not adopted in the manner required by law.
"Rule" is defined in § 120.52(16), Fla. Stat., as follows:
"Rule" means each agency statement of general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of an agency and includes any form which imposes any requirement or solicits any information not specifically required by statute or by an existing rule.
In Balsam v. Department of Health and Rehabilitative Services, 452 So.2d 976, 977-978 (Fla. 1st DCA 1984), this court held that any agency statement is a rule if it purports in and of itself to create certain rights and adversely affect others, or if it serves by its own effect to create rights, or to require compliance, or otherwise to have the direct and consistent effect of law. The limitations, conditions and requirements contained in the letter of April 4, 1988, adversely affect the substantive rights of others. The letter implements, interprets or prescribes law or policy, describes procedure or practice requirements of the agency, and imposes requirements or information not specifically required by statute or by existing rule. The letter, therefore, constitutes a rule within the meaning of the law and all agency rules must be adopted according to the procedures of § 120.54, Fla. Stat., or such rules constitute an invalid exercise of delegated legislative authority. § 120.52(8)(a), Fla. Stat.
DNR also contends that the hearing officer erred in finding that Rule 16B-33.002(56), which defines the term "under construction," was an invalid exercise of delegated *197 legislative authority. The definition establishes that only where there is a continuous physical activity of placing a foundation or continuation of construction above the foundation will the structure be deemed to be under construction. It also provides that a structure for which all construction activity has remained stopped for a period of six or more months will be deemed not under construction. Rule 16B-33.004(1), provides that structures under construction prior to the establishment of a CCCL are exempt from coastal permitting by DNR.
As provided by the plain language of these two rules, in order to decide whether a structure is exempt from coastal permitting, DNR need only determine whether the structure was under construction prior to the establishment of the CCCL. Neither of these rules specifically require a determination of whether the structure remains under construction after the CCCL is established, nor do these rules require that an exempt structure lose its exemption if it does not remain under continuous construction after it is found to be exempt. Furthermore, there is no language in Rule 16B-33.002(56) which could reasonably be interpreted to establish the requirement that an exempt structure remain under continuous construction in order to remain exempt.
An agency's interpretations of its own rules is entitled to great weight. Agencies are to be accorded wide discretion in the exercise of their lawful rule-making authority, clearly conferred or fairly implied and consistent with the agency's general statutory duties. Department of Professional Regulation v. Durrani, 455 So.2d 515 (Fla. 1st DCA 1984). Rule-making authority may be implied to the extent necessary to properly implement a statute governing the agency's statutory duties and responsibilities. Department of Professional Regulation v. Florida Soc'y of Professional Land Surveyors, 475 So.2d 939 (Fla. 1st DCA 1985). Moreover, the construction of a statute by an agency charged with its administration is entitled to great weight and will not be overturned unless clearly erroneous. Laborers' Int'l Union of N. Am., Local 478 v. Burroughs, 541 So.2d 1160 (Fla. 1989). However, the statutory construction must be a permissible one and the agency cannot implement "any conceivable construction of a statute ... irrespective of how strained or ingeniously reliant on implied authority it might be." State, Bd. of Optometry v. Florida Soc'y of Ophthalmology, 538 So.2d 878, 885 (Fla. 1st DCA 1988), review denied 542 So.2d 1333 (Fla. 1989). The deference granted an agency's interpretation is not absolute. "When the agency's construction clearly contradicts the unambiguous language of the rule, the construction cannot stand." Woodley v. Department of Health and Rehabilitative Services, 505 So.2d 676, 678 (Fla. 1st DCA 1987).
Rule 16B-33.002(56) requires, among other things, that there be a "continuous physical activity" on an exempt project, with periods of inactivity lasting no more than six months. DNR's requirement is an invalid exercise of delegated legislative authority because it enlarges, modifies and contravenes the specific provisions of the law implemented. DNR's general authority for adopting Rule 16B-33.002(56) is found in § 370.021(1), Fla. Stat., which authorizes DNR to "make, adopt, promulgate, amend, and repeal all rules and regulations necessary or convenient for the carrying out of the duties, obligations, powers and responsibilities conferred on the department or any of its divisions." According to DNR, the statutes which the rule implements are §§ 370.02(5), 161.052 and 161.053. Of particular importance to note is § 161.053(9), Fla. Stat., which provides:
The provisions of this section do not apply to structures intended for shore protection purposes which are regulated by Section 161.041 or to structures existing or under construction prior to the establishment of the coastal construction control line as provided herein, provided such structures may not be materially altered except as provided in subsection (5).
*198 (Emphasis added.) This section of the statute exempts from the effect of § 161.053, those structures which are under construction prior to the establishment of a CCCL. The statute establishes the point in time at which DNR determines whether a structure is under construction. DNR's requirement enlarges and modifies this statutory provision by authorizing the agency to continuously determine whether exempt structures remain under continuous construction after the establishment of a CCCL. The plain language of the statute requires DNR to determine whether a structure is under construction prior to the establishment of a CCCL and does not authorize DNR to determine whether a structure remains under construction or whether construction is abandoned after that date. After it has become exempt, the statute authorizes DNR only to prevent the owner from materially changing the structure. If the legislature intended that DNR require an exempt project to remain under continuous construction, it could have easily added the words "and after" to § 161.053(9) so that, in order to retain an exempt status, a project would have to be under construction both "prior to and after" the establishment of a CCCL.
Florida law clearly mandates that rules cannot enlarge, modify or contravene the provisions of a statute. State, Dept. of Business Regulation v. Salvation Limited, Inc., 452 So.2d 65 (Fla. 1st DCA 1984). The rule-making process cannot be used to make legal that for which there was no authority in the first place. Great American Banks, Inc. v. Division of Admin. Hearings, 412 So.2d 373 (Fla. 1st DCA 1981). If agency rules contravene the statute, they must be rejected as an invalid exercise of delegated legislative authority. E.M. Watkins & Co., Inc. v. Board of Regents, 414 So.2d 583 (Fla. 1st DCA 1982). For the foregoing reasons, Rule 16B-33.002(56) and DNR's requirement of "continuous construction" are rules that constitute invalid exercises of delegated legislative authority and the final order appealed is affirmed.
We recognize and appreciate DNR's desire to exercise some control over exempt construction seaward of the CCCL in order to prevent property owners from performing the minimum construction to come within the exempt provision of § 161.053(9) and then failing to complete the structure within a reasonable time. However, the proper means of attaining this authority is to secure legislation authorizing it.
AFFIRMED.
SMITH and BARFIELD, JJ., concur.
SCHWARTZ, ALAN R., Associate Judge, dissents with opinion.
SCHWARTZ, ALAN R., Associate Judge (dissenting).
In my judgment, the challenged rule represents no more than a rational explanation and elucidation of the ambiguous expression "under construction" as it is employed in section 161.053(9), Florida Statutes (1989), and does not therefore create any unauthorized addition to the provisions of the statute nor to the authority of the department. See Atlantic Coast Line R.R. v. Mack, 57 So.2d 447 (Fla. 1952).
The court's conclusion to the contrary rests upon the argument that the statutory requirement that a project be "under construction" prior to the establishment of the coastal control line precludes any restriction upon abandoning that construction afterwards. I believe, as the facts of this case show, that this view is without merit. The term "under construction" itself, which is one of process and not stasis, clearly connotes a continuum  that is, an extension over a period of time  rather than a situation as it exists at a particular point. See Webster's Third New International Dictionary 2487 (1986) ("under... 9c: in process of "). In other words, one can determine if a building is actually "under construction," even at a specific point, only by viewing, as it were, a time-lapse photograph encompassing not only that point, but also what has happened before and after during the whole history of the building. I agree with the department that when a picture of this kind shows as much *199 as six months of total inactivity after the coastal line was drawn, or that the project has not been completed within two years, it can be said that the property was not meaningfully "under construction" even prior to the establishment of the line.[1] In contrast, under the approach of the appellee, the hearing officer, and the majority, a contractor is able to secure its grandfathered rights to a building seaward of the control line if it merely begins construction on the day before the line is fixed, ceases the day after, and waits, presumably for decades, until it secures financing to complete the structure. But see Brennan v. Saco Const., Inc., 381 A.2d 656 (Me. 1978). But this is not what words like "under construction" mean as they have been interpreted and employed by cases, statutes, and authorities which deal with the present issue of the acquisition of vested rights to a non-conforming use. See League to Save Lake Tahoe v. Crystal Enters., 685 F.2d 1142 (9th Cir.1982) (construction project deemed to be abandoned under Tahoe Regional Planning Agency's Land Use Ordinance where construction ceased for more than one year); Smith v. Board of Appeals, 366 Mass. 197, 316 N.E.2d 501, 504 (1974) (statutory provision ... "should be interpreted so as to afford protection from zoning changes to good faith holders of building permits taken out before the first zoning notice who proceed with some diligence to build under such permits") (emphasis added); R. Anderson, American Law of Zoning §§ 6.28, 6.30 (3d ed. 1986); A. & D. Rathkopf, The Law of Zoning and Planning § 51.08 (4th ed. Supp. 1989). Since the rule before us simply reflects what I believe to be the mandatory, but which is certainly at least a permissible view of the statute, I cannot agree with the court's conclusion striking it down. See General Tel. Co. of Florida v. Marks, 500 So.2d 142 (Fla. 1986).
NOTES
[1] A different result would be indicated if the legislature had fixed the entitlement to building within the coastal construction line upon the mere existence of, say, "any construction" prior to that time. But it did not, and its use of the phrase "under construction" instead wholly supports the department's view of that statutory language.