1998 ME 244

**Bruce JOHNSON**

v.

**EXCLUSIVE PROPERTIES
UNLIMITED, et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs Oct. 14, 1998.
Decided Nov. 20, 1998.

Francis M. Jackson, Jackson & MacNicol, and Ralph W. Brown, Portland, for plaintiff.

Daniel F. Driscoll, Smith Elliott Smith & Garmey, P.A., Saco, for Harry Andrews, appellee.

Kent Lewis, Sebago Lake, for appellee.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, Justice.

[¶ 1] Bruce Johnson appeals from the judgment of the Superior Court (Cumberland County, *Brennan,* J.) in favor of defendants Harry Andrews and Kent Lewis. Johnson contends that the court erred by: (1) applying an incorrect legal standard in its analysis of his claim seeking to pierce the corporate veil; and (2) failing to hold either Andrews or Lewis personally liable as fiduciaries. We agree that the trial court erred by applying an incorrect legal standard when it declined to pierce the corporate veil and therefore vacate the judgment.

[¶ 2] In a jury-waived trial, Johnson presented evidence that established the following facts. Lewis was a real estate broker operating an unincorporated business under the name Exclusive Properties Unlimited until he surrendered his broker's license to the Maine Real Estate Commission in July 1988, pursuant to a consent agreement. As a broker, Lewis had secured options to purchase home sites at Lake Arrowhead Estates in Limerick ("Arrowhead") and made efforts to sell the lots. In 1989, Lewis and Andrews joined to form a corporation under the name Exclusive Properties Unlimited ("EPU"),[1] for the purpose of taking over the efforts of Lewis to market and sell the Arrowhead properties.

[¶ 3] In December 1989, Johnson signed a purchase and sale agreement ("the contract") with EPU for an Arrowhead site. Johnson paid $5,000 as earnest money and part payment to EPU. Lewis accepted Johnson's check, payable to EPU, on behalf of the corporation. Andrews deposited the funds in EPU's corporate bank account. The contract contained a clause releasing Johnson from performance if he was unable to obtain financing at eleven percent or less per annum. The contract also provided for a closing date within forty-five days and a forfeiture of the deposit upon Johnson's failure to perform. As the closing date approached, Johnson unsuccessfully attempted to negotiate either a discount from the contract price or a return of the deposit. Both parties considered the contract to remain in force during the negotiations, which continued after the closing date. After negotiations broke down, Johnson maintained that he was entitled to a return of his deposit because his good faith efforts to obtain suitable financing were unsuccessful. The defendants refused to return the deposit, on the grounds that Johnson failed to perform and reneged on his purchase obligation, despite available financing that satisfied the contract terms. The court found that Johnson was entitled to recover the deposit and entered summary judgment against EPU, but refused to pierce the corporate veil to hold Andrews or Lewis personally liable.

I. Piercing The Corporate Veil

[¶ 4] Although the court found that Andrews was an "alter ego" of EPU, and that EPU was liable for breach of contract, the court refused to ignore the corporate form and hold Andrews or Lewis personally liable. Citing *Theberge v. Darbro Inc.*, 684 A.2d 1298, 1301 (Me.1996), the court stated:

> To recover against Harry Andrews and/or Kent Lewis, Mr. Johnson must prove that

---

1. Unlike many other states, Maine does not require that the corporate name contain a reference to the corporate nature of the entity (*e.g.,* using words such as "Corporation," "Company," or "Incorporated," or abbreviations such as "Corp.," "Co.," or "Inc."). *See* 13–A M.R.S.A. § 301 (1981 & Supp.1997).

the corporate entity was the alter ego of an individual and, in the contract arena, that they engaged in some fraud or illegality with respect to the formation of the contract. Mr. Johnson has proven that the corporation was merely the alter ego of Mr. Andrews (but not Mr. Lewis). However, Mr. Johnson has failed to prove any fraudulent or illegal conduct on the part of either Mr. Andrews or Mr. Lewis with respect to the formation of the contract. Thus, Mr. Johnson's attempt to "pierce the corporate veil" must fail.

[¶ 5] As a matter of public policy, "corporations are separate legal entities with limited liability." *Theberge*, 684 A.2d at 1301 (quoting *Anderson v. Kennebec River Pulp & Paper Co.*, 433 A.2d 752, 756 n. 5 (Me.1981)). "As such, courts are generally reluctant to disregard the legal entity and will cautiously do so only when necessary to promote justice." *Anderson*, 433 A.2d at 756 n. 5. However, a court may pierce the corporate veil when equity so demands, and may disregard the corporate entity "when used to cover fraud or illegality, or to justify a wrong." *Id.* (quoting *Maine Aviation Corp. v. Johnson*, 160 Me. 1, 5, 196 A.2d 748, 750 (1964)).

[¶ 6] An examination of the different tests courts apply suggests two common elements that a plaintiff must establish before a court will disregard the corporate entity: (1) some manner of dominating, abusing, or misusing the corporate form; and (2) an unjust or inequitable result that would arise if the court recognized the separate corporate existence. *See, e.g., Bonnar–Vawter, Inc. v. Johnson*, 157 Me. 380, 387–88, 173 A.2d 141, 145–46 (1961); *Anderson*, 433 A.2d at 756; 1 William Meade Fletcher et al.,

*Fletcher Cyclopedia of the Law of Private Corporations* § 41 (perm. ed. rev.vol.1990). This two-pronged formulation provides a means for balancing the policy of encouraging business development with the policy of protecting those who deal with the corporation. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.1991).[2] Therefore, before a court may pierce the corporate veil, a plaintiff must establish that: (1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence.

[¶ 7] To determine whether a shareholder has abused the privilege of a separate corporate identity under the first prong of the piercing doctrine, courts examine a variety of factors. For example, Massachusetts courts weigh the following twelve factors:

(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity[,] assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.

*The George Hyman Constr. Co. v. Gateman*, 16 F.Supp.2d 129, 149–50 (D.Mass.1998).[3] Presumably, the court's finding that Andrews

---

2. The decision to pierce the corporate veil involves a determination of "whether-considering the totality of the evidence-the policy behind the presumption of corporate independence and limited shareholder liability-encouragement of business development-is outweighed by the policy justifying disregarding the corporate form-the need to protect those who deal with the corporation." *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.1991).

3. Some courts have been more willing to pierce the corporate veil to reach the assets of corporate shareholders, as opposed to individual share-

holders. *See Birbara v. Locke*, 99 F.3d 1233, 1237 n. 3 (1st Cir.1996). "Although corporate and individual defendants present slightly different questions, the analyses are sufficiently similar to warrant discussing them together, only distinguishing the two categories hen necessary." *Id.* (citations omitted). Therefore, the twelve factors apply whether the defendant is a corporate shareholder or individual shareholder, although some factors "may seem better suited to one inquiry than the other." *The George Hyman Constr. Co. v. Gateman*, 16 F.Supp.2d 129, 150 (D.Mass.1998).

was an "alter ego" [4] of EPU indicated that Johnson satisfied the first element of his piercing claim by demonstrating that Andrews abused the corporate form. *See id.* Therefore, the court did not err in its analysis under the first prong of the piercing doctrine.

■ [¶ 8] However, contrary to the court's assertion, the second prong of the piercing doctrine does not require a finding of fraud or illegality. *See Anderson,* 433 A.2d at 756 n. 5; *see also Wm. Passalacqua Builders, Inc.,* 933 F.2d at 141 (stating that New York's corporate disregard doctrine does not require a finding of fraud). Courts may also disregard the theory of separate corporate existence to prevent injustice or inequitable consequences. *See, e.g., Anderson,* 433 A.2d at 756 n. 5 (employing equitable estoppel theory to pierce the corporate veil). In fact, fraud or illegality may provide a basis of recovery against a shareholder independent of the piercing doctrine. Therefore, the court erred in concluding that only fraud or illegality can satisfy the second element.

[¶ 9] After finding that Andrews abused the privilege of a separate corporate identity, the court should have continued its analysis to inquire whether recognizing the separate corporate existence would produce an inequitable result. Since piercing the corporate veil is an equitable remedy, it is consistent with equitable principles to disregard the corporate entity where a claimant demonstrates both: (1) some misuse of the privilege of the corporate form; and (2) an inequitable result. *See Theberge,* 684 A.2d at 1301 (holding courts may pierce the corporate veil if:

(1) the corporation is a mere "alter ego"; and (2) "when necessary in the interest of justice").

## II. Escrow

[¶ 10] Johnson also claims that Andrews assumed a personal obligation as an escrow agent when he received Johnson's deposit from Lewis. Johnson argues that, as an escrow agent, Andrews is personally liable for any breach of fiduciary duty in handling the escrow funds.

[¶ 11] According to the terms of the contract for sale of real estate, EPU purported to hold Johnson's deposit in escrow as his escrow agent.[5] However, the court found as a factual matter that the parties failed to create an escrow agreement because they did not intend to do so, despite the contractual language.

■ [¶ 12] An "escrow" is a written instrument, imparting a legal obligation, that one party to a transaction (*i.e.,* grantor, promisor, or obligor) deposits with a third party, the escrow agent, for the escrow agent to hold until the performance of a condition or occurrence of an event, and then to deliver to the other party to the transaction (i.e., grantee, promisee, or obligee). *See Progressive Iron Works Realty Corp. v. Eastern Milling Co.,* 155 Me. 16, 19–20, 150 A.2d 760, 762 (1959); *Black's Law Dictionary* 641 (4th ed.1951). The creation of an escrow agreement consists of four elements: (1) an agreement regarding the subject matter and delivery of the deposit or instrument; (2) an escrow agent; (3) delivery of the funds or instrument to the escrow agent, conditioned

---

4. "Alter ego" literally means "second self." *See* Bryan A. Garner, *A Dictionary Of Modern Legal Usage* 46 (2d ed.1995). As one court recognized:

> The theories most frequently employed to justify piercing the corporate veil are agency, alter ego, instrumentality of the parent or stockholder, identity of interests, equitable estoppel, undercapitalization[,] and fraud, wrong[,] or injustice.... Some of these doctrines are interchangeable or at least overlap. A particular fact situation may fall under several doctrines.

*United Paperworkers Int'l. Union v. Penntech Papers, Inc.,* 439 F.Supp. 610, 617–18 n. 7 (D.Me.1977)(citations omitted). However, the use of terms such as "alter ego" or "instrumentality" has done little to clarify the piercing doctrine. *See id.* "[A]s Justice Cardozo noted, it is of little help to leave the actuality of the corporate relationship enveloped in the 'mists of metaphor,' or a jungle of semantics." *Id.* (citations omitted).

5. The contract for sale of real estate stated:

> [Johnson's] deposit is received and held by the broker, subject to the following conditions:
> 1. [EPU] shall hold said *earnest money or deposit* and *act as escrow agent* until transfer of title; that [one day] shall be given for obtaining the owner's acceptance; and, in the event of the owner's non acceptance, this deposit shall be promptly returned to [Johnson]....

upon the performance of an act or occurrence of an event; and (4) relinquishment by the grantor or depositor. *See, e.g., Press v. Marvalan Industries, Inc.*, 422 F.Supp. 346, 349 n. * (S.D.N.Y.1976).

[¶ 13] Whether an instrument that one party deposits with a third person is an escrow, rather than a completely executed instrument, depends on the intent of the parties, and is generally a question of fact for the factfinder. *See Progressive Iron Works Realty Corp.*, 155 Me. at 20, 150 A.2d at 762. We will not disturb the trial court's factual findings unless they are clearly erroneous. *See VanVoorhees v. Dodge*, 679 A.2d 1077, 1080 (Me.1996). The court's factual findings are clearly erroneous when the record lacks competent evidence to support them. *See id.*

[¶ 14] The party who asserts the existence of an escrow has the burden of proving its existence by a preponderance of the evidence. *See, e.g., Vellaringattu v. Caso*, 144 Misc.2d 519, 544 N.Y.S.2d 455, 457 (1989). No particular form of words is necessary to constitute an escrow. *See, e.g., Kunick v. Trout*, 85 N.W.2d 438, 445 (N.D. 1957). The use of the term "escrow" is a factor for courts to consider in determining the intent of the parties. *See, e.g., Lechner v. Halling*, 35 Wash.2d 903, 216 P.2d 179, 185 (1950). However, although such use is the clearest indication of the parties' intent, it does not necessarily create an escrow. *Id.*

[¶ 15] The court based its finding that the parties did not intend for Andrews to hold the deposit in escrow on the fact that "Johnson clearly delivered the earnest money deposit to EPU[,] and Andrews, acting as [EPU's] agent, deposited the money in [EPU's] account." Since a party generally cannot deposit escrow funds with the agent of an obligor or obligee, the court interpreted the failure of the parties to designate a third party escrow agent as a manifestation of intent that Johnson's check was not an escrow instrument. *See Progressive Iron Works Realty Corp.*, 155 Me. at 19–20, 150 A.2d at 762. Although the agent of an obligor or obligee may become an escrow agent if acting in an individual capacity and where it would not be antagonistic to the principal's interest, the record contains evidence to support the finding that Andrews was not acting in an individual capacity. *See id.* In light of the requirements for creating an escrow, the record contains evidence to support the court's finding that the parties did not actually intend for Andrews to become an escrow agent. *See VanVoorhees*, 679 A.2d at 1080. Therefore, we will not disturb the court's factual finding that the parties failed to create an escrow agreement.

The entry is:

Judgment vacated. Remanded for proceedings consistent with this opinion.

