STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-10-352

JIM'S PLUMBING & HEATING,
INC., et al,

Plaintiffs

v.                                                    ORDER

MICHAEL SALVAGGIO, et al,

STATE OF MAINE
Cumberland, ss, Clerk's Office

JAN 10 2012

RECEIVED

Defendants.

In this case plaintiffs Jim's Plumbing & Heating Inc., Westbrook Tools Inc., and James Michaud allege that defendants Michael Salvaggio and Bedford Falls Associates LLC are liable for breach of contract, quantum meruit, and fraud.[1] As against Salvaggio, plaintiffs also seek punitive damages and argue that they are entitled to pierce the corporate veil and hold him responsible for the liabilities of Bedford Falls.

Plaintiffs also seek to enforce mechanics liens against property owned by Bedford Falls and as to which plaintiffs claim priority over a mortgage interest held by defendant Home Loan Investment Bank.[2]

---

[1] The complaint originally contained three other causes of action: a breach of warranty claim (as to which no evidence or argument was offered at trial), an unjust enrichment claim (which does not need to be reached in view of the disposition of the breach of contract and quantum meruit claims), and a conversion claim (which also does not need to be reached in light of the disposition of the quantum meruit claim).

[2] Home Loan Investment Bank changed its name to Ocean Bank during the time period in which it made loans to Bedford Falls, and some of the exhibits in the case bear the name "Ocean Capital, a Division of Home Loan Investment Bank." However, the bank has since gone back to using only the Home Loan Investment Bank name, and for purposes of clarity will be referred to as Home Loan Investment Bank throughout this order.

In response, Bedford Falls has brought counterclaims against Westbrook Tools for various alleged breaches of a lease entered between Westbrook Tools and Bedford Falls in November 2008.

A jury-waived trial was held on November 8 and 9, 2011, and counsel for defendants and the Home Loan Investment Bank subsequently filed written submissions responding to the legal authority submitted by counsel for plaintiff at the time of closing argument.

On their fraud cause of action, plaintiffs have the burden of proof by clear and convincing evidence. E.g., Rand v. Bath Iron Works Corp., 2003 ME 122 ¶ 9, 832 A.2d 771, 773. On all other causes of action, with the exception of the claim for punitive damages, plaintiffs' burden of proof is by a preponderance of the evidence. In the findings of fact that follow, the court will identify those facts found by clear and convincing evidence to be highly probable; all other findings are by a preponderance.

The court finds as follows:

In 2006 and 2007, Bedford Falls obtained loans from Home Loan Investment Bank to purchase a former church located on School Street in Gorham and develop that property into a shared space housing a number of proposed businesses, including a cafe, a sports bar, a banquet center, and a wellness center. The sole member and officer of Bedford Falls Associates LLC is Michael Salvaggio, and his plan was for Bedford Falls to lease the church space to businesses operated by his sons.[3]

Bedford Falls purchased the church property in early 2007. Sometime after that, Salvaggio approached Jim Michaud, the owner of Jim's Plumbing & Heating, about performing the plumbing and HVAC work involved in the church renovation project.

---

[3] In April 2007 Bedford Falls entered into 23-year lease agreement with Four Brothers Corp., a company owned by Salvaggio's sons. The lease was to take effect upon completion of the renovation of the church building by Bedford Falls.

2

Salvaggio had previously worked for Michaud, and Michaud regarded him as a friend. Michaud and Salvaggio orally agreed that Jim's Plumbing would perform all the necessary plumbing and HVAC work for the entire Church project, with the work to be performed in stages. Under the agreement Bedford Falls was to be billed on a time and materials basis, with labor to be billed at a discounted rate of $70 per hour.

The first phase of the project was the cafe, which Four Brothers Inc. opened for business in the spring of 2008. By that point, however, Bedford Falls had experienced cost overruns and had spent virtually all of the loan funds it had received from Home Loan Investment Bank. It estimated that it needed an additional $350,000 to complete the project. Specifically, Bedford Falls documents acknowledge that Bedford Falls owed Jim's Plumbing at least $52,000 as of May 2008 and estimated that total cost of plumbing and HVAC work to complete the project would come to at least an additional $100,000.

Michaud had expressed his concern to Salvaggio over the unpaid amount and his prospects for being paid if he continued to work. As a result, Salvaggio solicited a letter from Home Loan Investment Bank to assuage Michaud's concerns. That letter, which generally followed wording suggested by Salvaggio, stated that the bank "is financing" the project known as the Church. The letter went on to state:

> The financing is currently being processed and once complete, it is anticipated that the business will generate enough cash flow to service expenses incurred during the construction period and going forward.

Plaintiffs' Ex. 43.

In fact, all but $1,115 of the financing provided by the bank had already been spent or committed, and no additional financing had been applied for or was being "processed." Nevertheless, this letter had the desired effect on Michaud and made him believe that more financing would be forthcoming.

3

The court finds by clear and convincing evidence that in showing this letter to Michaud, Salvaggio was making a material false representation, with knowledge of its falsity, for the purpose of inducing Michaud to rely on the letter, and that Michaud justifiably relied on that letter.

In May of 2008 Home Loan Investment Bank commissioned a report from a consultant as to the status of the church project. That report and its attachments specifically informed the bank that work necessary to complete the project included finishing the plumbing and HVAC systems, that Jim's Plumbing was owed $52,696.79 as of May 2008 and that it was estimated that another $40,000 would need to be paid to Jim's Plumbing to complete its work.

Because Bedford Falls was running short of funds, Jim's Plumbing performed only a limited amount of work during the summer of 2008. Although it occasionally continued to perform to perform some work on the church project from September 2008 through the end of 2009, it sent few invoices to Bedford Falls during that period. As of the end of 2008, Jim's Plumbing was owed at least $100,000 by Bedford Falls.

By the end of 2008 Salvaggio was trying as best he could to keep the project going. The sports bar was finally ready to be opened, but by then Salvaggio had decided not to have his sons operate that business but to bring in a company that already operated several similar establishments. In that same time period Salvaggio went to Michaud and said that although the café was operating and the sports bar was about to open, the project was in trouble and Salvaggio was afraid that he would lose his business. He said he needed a third lease to show the bank and keep the building from being repossessed. Salvaggio told Michaud that if Michaud leased the banquet center space for $3000 a month and renovated it, Salvaggio would then lease the banquet center back from him for $4000 a month once additional financing had been

4

obtained and additional cash flow was available. At that point, Salvaggio said, he would also be in a position to pay the amounts owed to Jim's Plumbing.

Michaud did not want to operate a banquet center and only agreed to the proposal because he trusted Salvaggio, because he believed Salvaggio's promise that he would be able to lease back the banquet center to Salvaggio for $4000 per month, because he knew he would not receive the money he was already owed if the church were repossessed, and because Salvaggio assured him that Salvaggio was in line to receive $400,000 in additional financing from Home Loan Investment Bank.

The court finds by clear and convincing evidence, based on its evaluation of the credibility of the witnesses and the testimony and documentary evidence presented at the trial, that Salvaggio made material false representations to Michaud to induce him to enter the banquet center lease, that Salvaggio knew those representations were false in that Salvaggio had no intention subleasing the banquet center back from Michaud and had no expectation at that time of receiving further bank financing, and that Michaud justifiably relied on those representations in entering the lease.[4]

Salvaggio drafted a lease for Michaud to sign, telling Michaud he needed it signed in a hurry. Michaud did not consult a lawyer even though there was a lawyer whom he consulted on an occasional basis in his business activities. The lease as signed was from Bedford Falls to Westbrook Tools Inc., an inactive company that Michaud had previously formed to take ownership of certain patents that Michaud had applied for. The lease drafted by Salvaggio did not contain any reference to his promise to lease back the banquet center once renovated.

---

[4] To the extent that any of Salvaggio's misrepresentations could be characterized as misrepresentations of intention or opinion rather than of fact, those misrepresentations still constituted fraudulent misrepresentations under the circumstances of this case. See Restatement 2d Torts §§ 539, 544 (1977).

Pursuant to the agreement between Michaud and Salvaggio, Westbrook Tools then proceeded to act in the role of a general contractor in renovating the banquet center space, making the specified rental payments to Bedford Falls from February 2009 through March 2010. In order to make those rental payments and finance the renovations, Michaud drew on a personal home equity line of credit.

In the meantime representatives of the Home Loan Investment Bank made various site visits to the church project, noting the progress of the work and the work yet to be performed. In early 2009 a sprinkler system accident resulted in the closure of both the cafe, which had been operating for almost a year, and the sports bar, which had just opened. Neither business resumed operations. As a result, the rental payments from Westbrook Tools were Bedford Falls's only source of income after the sprinkler accident.

During this time period Salvaggio, having realized the extent of Michaud's trusting nature, persuaded Michaud to make additional payments to Salvaggio and Bedford Falls – first to resolve a spurious personal injury claim that Salvaggio told Michaud was about to be filed against Jim's Plumbing and/or Westbrook Tools. Later, aware that Westbrook Tools had just received an insurance check for damage resulting from the sprinkler accident, Salvaggio went to him and told him that Bedford Falls was finally about to receive $400,000 in further financing but that Salvaggio could not obtain that amount unless he was able to make a ten percent downpayment. Salvaggio therefore persuaded Michaud to write out checks totaling $40,000 to Bedford Falls from

the Westbrook Tools insurance proceeds and Michaud's personal account to pay the alleged downpayment.[5]

In all of the above instances the court finds by clear and convincing evidence that Salvaggio knowingly made material false representations for the purpose of inducing Michaud to make the payments in question and for the accompanying purpose of inducing Michaud to continue making the Westbrook Tools lease payments based on Salvaggio's assurances that Bedford Falls was about to receive $400,000 in financing.

For his part, Salvaggio testified at trial that in each case where Michaud or Westbrook Tools had made out checks to Bedford Falls in 2009 other than the Westbrook Tools rent checks, he had, after depositing those checks, withdrawn cash in same amounts, and then given the cash back to Michaud – in effect laundering the money – so that Michaud could invest that money in a cannabis venture. He further testified that Michaud had agreed to accept the laundering of his money into cash as full payment of the amount owed to Jim's Plumbing. There is evidence that Salvaggio was making cash withdrawals, but his testimony was not otherwise credible.

When the loan proceeds were not immediately forthcoming, Salvaggio offered various and increasingly strained excuses that in retrospect should have awakened Michaud's suspicions but which, given Michaud's continued trust in Salvaggio (who is nothing if not a great salesman) and the fact that Michaud was continuing to cling to the hope that he would be repaid all the money he was owed, Michaud accepted at the time.

In early 2010, based on assurances that $400,000 in financing would be forthcoming, Jim's Plumbing performed more than $40,000 worth of additional work on

---

[5] Contemporaneous entries in Michaud's ledger (Exhibit 12) corroborate Michaud's testimony that the checks paid to Salvaggio and Bedford Falls were for the alleged personal injury claim and the alleged downpayment.

7

the church property. On January 10, 2010 Salvaggio fraudulently induced Michaud to pay him an additional $ 5000 to cover alleged brokerage costs on the $ 400,000 loan.

On February 1, 2010 Salvaggio prepared – and Michaud signed – a release stating that Michaud, Westbrook Tools, and Jim's Plumbing released Bedford Falls, Four Brothers Corp., and Michael Salvaggio from all claims, actions, damages, expenses and compensation "which the undersigned now has/have or which may hereafter accrue to the property located at 29 School Street in Gorham, Maine." The release further stated that all labor and materials "provided from May 2007 to the present have been satisfied and paid in full." Defendants' Ex. 3.[6]

Michaud signed the release because Salvaggio told him that Bedford Falls was about to receive the long-awaited $400,000 in financing and that Michaud and his companies needed to sign the release in order to get paid. From Michaud's perspective this did not raise suspicions. He knew that subcontractors often sign and submit lien waivers in advance in order to receive subsequent payment. Similarly, when Westbrook Tools had received its insurance settlement for damage caused by the sprinkler accident, it had signed a release on November 4, 2009 (Plaintiffs' Ex. 39) but had not received a check until at least 5 days later.[7] Moreover, Michaud still trusted Salvaggio.

---

[6] It also stated:

> The undersigned further declare(s) and represent(s) that no promise, inducement, or agreement between the parties hereto {sic], and that the terms of this Release are contractual and not a mere recital.

This may have been intended to mean that no promise or inducement or agreement not expressed in the release was made, but the crucial language to convey that intention was omitted. As discussed below, it appears as if Salvaggio borrowed much of the language in Defendants' Ex. 3 – with some adaptations and some drafting errors – from releases that both Bedford Falls and Westbrook Tools had previously signed in connection with the sprinkler accident.

[7] The check is dated November 9, 2009. Plaintiffs' Ex. 38. Bedford Falls had received a similar insurance payment (see Defendants' Ex. 2), and much of the language in Salvaggio's release appears to have been copied from the insurance release. A crucial difference between the insurance release and Defendants' Ex. 3, however, is that the insurance release recited the

8

The court finds by clear and convincing evidence that Salvaggio knowingly and falsely represented to that Michaud needed to sign the release that Salvaggio had prepared in order to receive payment for the money that Jim's Plumbing, Westbrook Tools, and Michaud were owed, that Salvaggio did so to induce Michaud to execute the release, and that Michaud justifiably relied on those representations in signing the release. In addition, Michaud, Westbrook Tools, and Jim's Plumbing received no consideration in exchange for the release. Based on Salvaggio's representations, they expected to receive consideration in the future once Salvaggio received the $400,000 loan.

Thereafter, when payment was not immediately forthcoming and Michaud began seeking increased assurances that he would be paid, Salvaggio drafted a document entitled "Payment Agreement" which he and Michaud signed. Knowing that he already had Michaud's release in hand, Salvaggio did not date the "Payment Agreement," which in its entirety read as follows:

> Pending the closing of a commercial loan Bedford Falls Associates will make payment to Westbrook Tools Inc. and Jim's Plumbing & Heating.
>
> Payment will be made three business days after closing.

Plaintiffs' Ex. 8.

As with the rest of his testimony, the court does not find Salvaggio's explanation of the Payment Agreement to be credible[8] and accepts Michaud's testimony as to the

---

consideration given in exchange for the release. The Salvaggio release did not recite any consideration, and no consideration had in fact been given.

[8] Because he had left the Payment Agreement undated when he drafted it, Salvaggio was able to testify at trial that the Payment Agreement was executed in the summer of 2008, before Salvaggio had reached his alleged agreement with Michaud to pay Michaud for his work by laundering funds for him without actually giving him any money. Among the problems with this testimony are that (1) Salvaggio's commercial loans had all closed long before the summer

9

timing and circumstances of the Payment Agreement. The Payment Agreement thus constitutes an admission that the money owed to plaintiffs was still unpaid. It also constitutes an admission that Bedford Falls had a debt to Westbrook Tools as well as to Jim's Plumbing – contradicting defendants' contention that they owe nothing to Westbrook Tools and that no promises were made to Westbrook Tools when it signed the November 2008 lease.

As noted above, in expectation of payment and because Michaud understood that Salvaggio was about to receive funds to complete the project, Jim's Plumbing performed significant additional work on the church project in 2010, and Westbrook Tools continued its renovation work on the banquet space. On March 25, 2010 Jim's Plumbing performed work at the project valued at 525.41 in labor and materials. On or after March 29-31, 2010, Westbrook Tools arranged for delivery of materials from Hillside Lumber and $4241.98 worth of paint from Sherwin Williams to the church.

However, in early April 2010, with payment still not forthcoming, Michaud told Salvaggio he was out of money and asked Salvaggio for help. Two days later, on or about April 10, Salvaggio locked Michaud out of the church. He originally told Michaud that he had changed the locks because of an alleged break-in. After Michaud filed this suit, Salvaggio took the position that he had evicted Michaud upon the failure of Westbrook Tools to pay the April rent. He takes this position even though the lease which he authored (1) does not specify what day of the month the monthly rent is due and (2) requires Bedford Falls to give a written notice of default before enforcing its rights as a landlord. Salvaggio testified that he did give written notice but that his copy

---

of 2008, and (2) Westbrook Tools had not yet become involved with the church project at the time Salvaggio claims the payment agreement was signed.

of that notice was conveniently taken in the alleged "break in." That testimony was not credible.

Jim's Plumbing and Westbrook Tools filed their mechanics liens and gave notice to defendants on April 21, 2010 – within 90 days from the dates when the last work was performed and/or the last materials were furnished. See 10 M.R.S. § 3253(1). This suit was commenced on July 19, 2010 -- within 120 days of the dates when the last work was performed and/or the last materials were furnished. See 10 M.R.S. § 3255(1).

The total unpaid amount owed to Jim's Plumbing is $ 155,405.16. The total value of the services performed and materials furnished by Westbrook Tools in connection with renovation of the banquet space was $135,662.70. Bedford Falls, by retaining the value of those services and materials, has been unjustly enriched in that amount.

Defendants' Liability for Breach of Contract, Quantum Meruit, and Fraud

Based on the above findings, Jim's Plumbing is entitled to recover $ 155,405.16 from Bedford Falls for breach of contract based on the failure by Bedford Falls to live up to its agreement to pay Jim's Plumbing on a time and materials basis.

Based on the above findings, Westbrook Tools is entitled to recover $ 135,662.70 from Bedford Falls in quantum meruit. This represents the value of the services it performed and the materials it provided to Bedford Falls. See Paffhausen v. Balano, 1998 ME 47 ¶ 7, 708 A.2d 269, 271. A quantum meruit claim requires that services be provided by the plaintiff to the defendant with the defendant's knowledge and consent under circumstances that make it reasonable for defendant to expect payment. Id. ¶ 8. In this case the elements of quantum meruit are met because Westbrook Tools furnished materials and services for the renovation of the banquet space reasonably expecting payment based upon Salvaggio's express representation that it would be compensated

11

when Bedford Falls leased the banquet space back at a higher rental rate after the renovation was complete.

Bedford Falls bases its defense to the claims by Westbrook Tools upon the lease, which purported to place all financial responsibility for renovation of the banquet space on Westbrook Tools. The findings above, however, demonstrate that all of the necessary elements of fraudulent inducement have been proven by the requisite standard of proof to render the lease invalid. See Glynn v. Atlantic Seaboard Corp., 1999 ME 53 ¶ 10, 728 A.2d 117, 119; Harriman v. Maddocks, 518 A.2d 1027, 1029-30 (Me. 1986). Bedford Falls and Salvaggio also rely on the purported February 1, 2010 release as a bar to all of plaintiffs' claims. The findings above also demonstrate that all of the necessary elements of fraudulent inducement have been proven by the requisite standard of proof to render the release invalid.

A party commits fraud if he makes a false representation of a material fact, with knowledge of its falsity, for the purpose of inducing another to act in reliance on that representation, and the other party justifiably relies on that representation to his detriment. Glynn v. Atlantic Seaboard Corp., 1999 ME 53 ¶ 10, 728 A.2d at 119, quoting Letellier v. Small, 400 A.2d 371, 376 (Me. 1979). In this case defendants deny that any false representations were made, but the court has found against them on that issue.

Defendants' fallback argument is that Michaud did not "justifiably" rely on Salvaggio's false representations. In Letellier v. Small, the Law Court held that a party who knowingly makes false representations cannot escape responsibility even if the defrauded party was negligent in relying on those representations. 400 A.2d at 374-76. "Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him." 400 A.2d at 376. In this case the court finds by clear and convincing evidence that, however negligent Michaud may have been in not realizing Salvaggio's

12

duplicity at various points prior to the signing of the release, Michaud did not know that Salvaggio's representations were false not was their falsity obvious to him.

In making this finding, the court has evaluated all the testimonial and documentary evidence in the case along with the credibility and demeanor of the witnesses. Michaud has been in the plumbing business for many years, but he is a person who lives up to his commitments[9] and who trusts in the honesty of others. He specifically and naively trusted Salvaggio, whom he considered a friend, in this case. Michaud had been given the Bank's March 28, 2008 letter stating (falsely) that financing was being processed and that once that financing was completed, "it is anticipated that the business will generate enough cashflow to service expenses incurred during the construction period." Thereafter, already owed considerable sums, Michaud was induced to enter into the lease to help keep the project afloat until the promised financing came through and both Jim's Plumbing and Westbrook Tools could be made whole. Finally, as noted above, Michaud signed the release because he had in the past signed such releases and submitted them in advance of receiving any funds.[10]

The Letellier principle – that contributory negligence is not a defense when a party engages in knowingly fraudulent misrepresentations – necessarily protects victims who are naïve and overly trusting as well as victims who exhibit a reasonable degree of wariness and caution. As a result, the court finds that plaintiffs' claims are not

[9] Their involvement in the Bedford Falls project left Jim's Plumbing and Westbrook Tools owing significant debts to various suppliers, and Michaud has been reaching into his personal assets to pay those debts while pursuing this action.

[10] When lawyers are involved, releases that are obtained in advance are considered to be held in escrow. When less sophisticated parties are involved, the concept of an escrow is not articulated but it is still understood that the releases are submitted in exchange for future payment. This is among the reasons why the instant case is distinguishable from Francis v. Stinson, 2000 ME 173, 760 A.2d 209. The oral representations in Francis were contradicted by the document the plaintiffs signed. See, e.g., 2000 ME 173 ¶ 44, 760 A.2d at 218. In this case the release signed by Westbrook Tools and Jim's Plumbing was consistent with the misrepresentation made by Salvaggio – that they needed to sign the release in order to receive payment.

13

barred by the terms of the November 6, 2008 lease or by the February 1, 2010 release. Based on the findings above, defendants' reliance on the release is also barred because plaintiffs received no consideration in exchange for the release. Doughty v. Sullivan, 661 A.2d 1112, 1123-24 (Me. 1995).

It follows from the findings above that Bedford Falls is also liable to Jim's Plumbing and Westbrook Tools for fraud. The fraud as to Jim's Plumbing began when Salvaggio showed Michaud the misleading March 28, 2008 letter that he had obtained from the bank. On its fraud claim, therefore, Jim's Plumbing is entitled to recover $ 50,334.30, representing the value of the subsequent work that it performed in reliance on Salvaggio's various misrepresentations. As to Westbrook Tools, the court finds that the amount it is entitled to recover on its fraud claim is $ 237,662.70 – the total of the value of the services it performed and the materials it provided in reliance on Salvaggio's fraudulent misrepresentations ($ 135,662.70), the amount it paid to Bedford Falls under the lease that it was fraudulently induced to enter ($ 39,000), and the additional checks it provided to Salvaggio and Bedford Falls based on Salvaggio's false representations ($ 63,000).[11]

Michael Salvaggio is also individually liable on both fraud claims because he personally participated in, and was the author of, the fraudulent misrepresentations in question. See Advanced Construction Corp. v. Pilecki, 2006 ME 84 ¶ 13, 901 A.2d 189, 195. In this respect, his personal liability for his own wrongful acts is distinct from any liability he might have if plaintiffs are successful in piercing the corporate veil. Id.

---

[11] These amounts overlap with the amounts that Jim's Plumbing is entitled to recover for breach of contract and that Westbrook Tools is entitled to recover for quantum meruit. Excluding punitive damages, Jim's Plumbing is therefore entitled to recover a maximum of $ 155,405.16, and Westbrook Tools is entitled to recover a maximum of $237,662.70.

14

Counterclaims of Defendant Bedford Falls Associates

The foregoing findings necessarily dispose of the counterclaims asserted by Bedford Falls. All of the counterclaims are based upon alleged breaches of the November 6, 2008 lease, and Bedford Falls is not entitled to enforce the provisions of that lease for the reasons set forth above. Moreover, the claim by Bedford Falls for unpaid lease payments fails for an additional reason – Bedford Falls never gave Westbrook Tools a written notice of default and was therefore not entitled to assert its rights based on the latter's alleged default.


Misuse of Corporate Form

Although Salvaggio has been found personally liable on the fraud claim, the court also needs to consider whether, in the alternative, he should also be held liable for the damages assessed against Bedford Falls based on plaintiff's claim that the corporate form of Bedford Falls should be disregarded. This issue is not entirely academic because the damages due to Jim's Plumbing on its breach of contract claim exceed the damages on its fraud claim. In order to pierce the corporate veil and disregard a corporate entity, plaintiffs have to establish (1) that Salvaggio abused the privilege of a separate corporate entity and (2) that an unjust and inequitable result would occur if the court recognized the separate corporate entity. Johnson v. Exclusive Properties Unlimited, 1998 ME 244 ¶ 6, 720 A.2d 568, 571.

In considering whether corporate form has been abused, the Johnson decision sets for a list of factors to be evaluated. Id. ¶ 7. In this case the court finds the following Johnson factors to be present: (1) that Bedford Falls is solely owned and pervasively controlled by Michael Salvaggio; (2) that Salvaggio intermingled his personal activities and assets with those of the corporation; (3) that corporate formalities were not

15

observed; (4) that corporate records are absent, some purportedly lost in the alleged "break-in;" (5) that the only asset of Bedford Falls is the church property, which is mortgaged to the bank, and that there is a substantial possibility that Bedford Falls may be judgment proof; (6) that corporate assets were siphoned off by Salvaggio, e.g., by mysterious withdrawals of cash; (7) that Bedford Falls existed solely for the benefit of Salvaggio and his family; and (8) that Bedford Falls, as set forth above in detail, was used by Salvaggio to promote fraud. The court also finds that an unjust and inequitable result would occur if Jim's Plumbing and Westbrook Tools were unable to recover their losses from Bedford Falls and Salvaggio were able to walk away unscathed.

In their post-trial submission defendants argued that plaintiffs had waived their claim for piercing the corporate veil by not mentioning it in closing argument. The court disagrees for two reasons. First, argument with respect to piercing the corporate veil was contained in the legal outline that counsel for plaintiff submitted at the time of his closing argument. Second, the court is not aware of any authority for the proposition that, if sufficient evidence is offered to support a cause of action, that cause of action is nevertheless barred unless counsel also mentions that claim in closing argument.[12]

Accordingly, the court rules that the corporate veil may be pierced and that Michael Salvaggio is personally liable for any damages assessed against Bedford Falls.

Punitive Damages

To recover punitive damages, plaintiffs must prove by clear and convincing evidence that Michael Salvaggio acted with malice. Malice may exist where deliberate conduct by a defendant, although not necessarily motivated by actual ill will toward the

[12] In jury trials, counsel frequently focus on some of their claims and defenses during their closing arguments and do not mention others, leaving them without comment but understanding that the jury will consider them in light of the court's instructions.

16

plaintiff, is so outrageous that malice toward the plaintiff can be implied. Newbury v. Virgin, 2002 ME 119 ¶ 21, 802 A.2d 413, 418. In this case the court finds by clear and convincing evidence that Salvaggio's behavior in connection with the proven fraud claim was so outrageous that malice toward Michaud can be implied. In this connection, the court relies not just on Salvaggio's duplicity (which would be sufficient on its own) but on his abrupt lock-out of Michaud the moment it was evident that he could not string Michaud along any farther.

Under all the circumstances, considering recent guidance as to the award of punitive damages,[13] the court concludes that the appropriate amount of punitive damages would equal double the actual damages that have been assessed on plaintiffs' claim for fraud – resulting in an award of $ 100,000 in the case of Jim's Plumbing and $ 475,000 in the case of Westbrook Tools.

## Claims of Michaud Individually

In addition to Jim's Plumbing and Westbrook Tools, James Michaud is a named plaintiff in this action. There was evidence, moreover, that to keep the project going and pay the obligations of his companies, Michaud withdrew funds from a home equity line of credit and otherwise dipped into personal assets. Michaud also wrote some checks on his personal account, but he indicated on those checks that he was making them out as President of Westbrook Tools. See Plaintiffs' Ex. 3E. It would therefore appear that to the extent that Jim's Plumbing and Westbrook Tools recover damages, Michaud will be entitled to reimbursement from those companies for any amounts he personally contributed but that he does not have an independent claim.

---

[13] See Alexander, Maine Jury Instruction Manual § 7-114 (2011).

17

As far as the court recalls, no evidence was offered that Michaud personally was financially damaged in any amount that went beyond what would be reimbursed by his companies. Accordingly, the court is not inclined to award any damages to Michaud in his individual capacity but will withhold any final ruling for 10 days to allow counsel for Michaud to submit any comments on that issue. If counsel for Michaud submits comments arguing in favor of an award for Michaud in his individual capacity, counsel for defendants shall have 10 days in which to respond.

Mechanics Lien Claim

The above findings resolve certain issues with respect to plaintiffs' mechanic's lien claim, but several issues remain to be resolved in determining whether Jim's Plumbing and Westbrook Tools can enforce their liens as against the mortgage interest of Home Loan Investment Bank. The mechanic's lien statute provides in pertinent part:

> Whoever performs labor or furnishes labor or materials . . . used in erecting, altering, moving or repairing a house, building or appurtenances . . . by virtue of a contract with <u>or by consent of the owner,</u> has a lien thereon and on the land on which it stands and on any interest such owner has in the same, to secure payment thereof, with costs.

10 M.R.S. § 3251 (emphasis added). For purposes of the statute a mortgagee is considered an owner to the extent of its mortgage interest. F.R. Carroll Inc. v. TD Bank, 2010 ME 115 ¶ 9, 8 A.3d 646, 649. Because there is no contract between plaintiffs and the Bank, the issue in this case is whether the Bank can be found to have consented to plaintiffs' work.

Under the F.R. Carroll decision, consent need not be express but may be implied so long as the contractor proves (1) knowledge on the part of the mortgagee of the nature and extent of the work being performed on the premises and (2) conduct on the

18

part of the mortgagee justifying an expectation and belief on the part of the contractor that the mortgagee had consented. Id. ¶ 10. Whether a mortgagee consented to work performed on the premises is a fact-specific inquiry. Id. ¶ 11.

In this case the court finds that from the outset of the project, the Bank knew that Bedford Falls intended to remodel and renovate the existing church building and that the project was not viable unless most or all of the separate components of the project contemplated by Salvaggio (café, sports bar, banquet/events center, wellness center) were operating. Throughout the project, representatives of the Bank monitored the project, making periodic site visits and observing and reporting on the work that had been done and the work that remained to be done. These are all facts from which, under the F.R. Carroll decision, the mortgagee's knowledge may be found. 2010 ME 115 ¶ 14, 8 A.3d at 650. The court specifically finds that the Bank expected and intended that plumbing, HVAC, and other renovation work would be provided by contractors such as Jim's Plumbing and Westbrook Tools and that the Bank had ongoing knowledge of that work as it was being performed.[14]

Under the F.R. Carroll decision, the same facts would permit an inference that the Bank's conduct justified Michaud's belief that the Bank had consented to the work performed by his companies. See 2010 ME 115 ¶ 16, 8 A.3d at 651. In this case, however, there is considerably more. First, at the outset of the job, Jim's Plumbing received a payment of approximately $8,000 directly from the Bank for some specific equipment. Second, as of May 2008 the Bank was specifically informed in the Broadlands document that a significant sum was due to Jim's Plumbing for work already performed and that

---

[14] Notably, the F.R. Carroll decision does not require that the mortgagee specifically know the identity of the contractor providing the services in question and also allows a mechanic's lien to be enforced when the work was performed after the bank had made the final disbursement on its loan. See 2010 ME 115 ¶¶ 5-6, 8 A.3d at 648.

19

it was contemplated that additional significant amounts would have to be paid to Jim's Plumbing and other contractors to finish the project.

Third, and perhaps most tellingly, the Bank's March 28, 2008 letter (Plaintiff's Ex. 42) – specifically solicited by Salvaggio to be given to Michaud – misleadingly stated that further financing was being processed and that the Bank anticipated that construction expenses would be paid once financing was complete. This letter was designed to assure Michaud that when construction was complete, Michaud's companies would begin to receive their money. See Plaintiffs' Ex. 42. Because the Bank expressly participated in leading Michaud on, the court finds that the Bank's conduct justified Michaud's belief that the Bank consented to the work in question.

The Bank also argues that plaintiffs should not be entitled to enforce their lien with respect to work performed by Jim's Plumbing in 2007 and 2008 because Jim's Plumbing largely suspended work in mid-2008. There is authority for the proposition that a single lien cannot cover distinct alterations in a building made at different times and independent of each other. See Farnham v. Richardson, 91 Me. 559, 565 (1898). However, where there is one continuing contract that does not involve distinct jobs, a suspension of work that is not caused by the contractor will not prevent a lien filed within the statutory period from relating back to all the earlier work that was performed. See Van Wart v. Rees, 112 Me. 404, 405-07 (1914).

In this case the Bank understood that all of the components were part of a single project, and Salvaggio hired Jim's Plumbing to perform all the plumbing and HVAC work for the entire project. The suspension of work in 2008 was not caused by Jim's Plumbing but by Bedford Falls's lack of funding. Moreover, the evidence in this case demonstrates that the work performed by Jim's Plumbing and Westbrook Tools during the 90 days prior to the filing of their liens on April 21, 2010 was not an afterthought

20

intended solely to revive stale lien claims but was a continuation of the work Westbrook Tools had been performing and a resumption of the work that Jim's Plumbing had been performing.[15] The court concludes that from the Bank's point of view, from Salvaggio's point of view, and from the contractor's point of view, there was one overall project and that plaintiffs' lien filings were timely.

The entry shall be:

1. On plaintiffs' breach of contract claim, judgment is entered in favor of plaintiff Jim's Plumbing & Heating Inc. against defendant Bedford Falls Associates LLC in the amount of $ 155,405.16.

2. On plaintiffs' quantum meruit claim, judgment is entered in favor of plaintiff Westbrook Tools Inc. against defendant Bedford Falls Associates LLC in the amount of $ 135,662.70.

3. Because plaintiffs prevailed on their claim that Bedford Falls Associates was an alter ego of defendant Michael Salvaggio, defendant Michael Salvaggio shall be jointly and severally liable for the judgments against Bedford Falls Associates on the above breach of contract and quantum meruit claims.

4. On plaintiffs' fraud claim, judgment is entered in favor of plaintiff Jim's Plumbing & Heating Inc. against defendants Bedford Falls Associates LLC and Michael Salvaggio, jointly and severally, in the amount of $ 50,334.30.

5. On plaintiffs' fraud claim, judgment is entered in favor of plaintiff Westbrook Tools Inc. against defendants Bedford Falls Associates LLC and Michael Salvaggio, jointly and severally, in the amount of $ 237,662.70.

6. Judgment for punitive damages is entered against Michael Salvaggio in the amount of $100,000 for Jim's Plumbing & Heating Inc. and $ 475,000 for Westbrook Tools Inc.

7. On plaintiffs' mechanic's lien claim, judgment shall be entered declaring that plaintiffs Jim's Plumbing & Heating Inc. and Westbrook Tools Inc. are entitled to enforce their liens against the church property in the amount of $ 155,405.16 and $ 135,662.70 respectively, that those liens have priority over any interest of defendants Bedford Falls Associates LLC and Michael Salvaggio, and that those liens also have priority over any interest of Home Loan Investment Bank. To the extent that plaintiffs seek further orders from

---

[15] As noted above, although Jim's Plumbing had suspended work in 2008 due to the project's financial straits, it performed some additional work in 2009 and substantial work in 2010.

21

the court to enforce those liens by requiring a sale of the property or otherwise, counsel for plaintiffs shall submit any proposed orders and provide same to counsel for defendants and the party in interest, who shall have 14 days in which to submit any opposition or comments.

8. Judgment shall be entered against defendant Bedford Falls Associates LLC on its counterclaims.

9. The court will await a submission from plaintiffs within 10 days if they contend that plaintiff James Michaud has an independent entitlement to damages. Absent such a submission, the court will enter final judgment providing that Michaud shall not be entitled to any recovery.

The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January __10__, 2012

Thomas D. Warren
Justice, Superior Court

-------------------------------------------------------------------------------

| SEL VD | | REPRESENTATION | TYPE | | DATE |
|---|---|---|---|---|---|
| 01 0000000710 ATTORNEY:JONES, DAVID J | | | | | |
| ADDR:11 MAIN STREET SUITE 4 KENNEBUNK ME 04043 | | | | | |
| F FOR:OCEAN BANK FSB | | DEF | | RTND | 07/28/2010 |
| F FOR:HOME LOAN INVESTMENT BANK FSB | | DEF | | RTND | 07/28/2010 |
| | | | | | |
| 02 0000002391 ATTORNEY:OLAFSEN, KURT | | | | | |
| ADDR:75 PEARL STREET SUITE 215 PORTLAND ME 04101 | | | | | |
| F FOR:BEDFORD FALLS ASSOCIATES LLC | | DEF | | RTND | 10/04/2010 |
| F FOR:MICHAEL SALVAGGIO | | DEF | | RTND | 10/04/2010 |
| | | | | | |
| 03 0000008401 ATTORNEY:RIELLY, BRENDAN | | | | | |
| ADDR:10 FREE STREET PO BOX 4510 PORTLAND ME 04112 | | | | | |
| F FOR:HOME LOAN INVESTMENT BANK FSB | | DEF | | RTND | 10/03/2011 |
| | | | | | |
| 04 0000000299 ATTORNEY:STEVENS, GRAYDON | | | | | |
| ADDR:53 EXCHANGE ST PO BOX 597 PORTLAND ME 04112-0597 | | | | | |
| F FOR:JAMES MICHAUD | | PL | | RTND | 07/19/2010 |
| F FOR:WESTBROOK TOOLS INC | | PL | | RTND | 07/19/2010 |
| F FOR:JIMS PLUMBING AND HEATING INC | | PL | | RTND | 07/19/2010 |

| SEL VD | | REPRESENTATION | TYPE | | DATE |
|---|---|---|---|---|---|
| 01 0000000710 ATTORNEY:JONES, DAVID J | | | | | |
| ADDR:11 MAIN STREET SUITE 4 KENNEBUNK ME 04043 | | | | | |