STATE OF MAINE
LINCOLN, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-2016-02

ROBERT J. RUBIN &
CHERYL AYER,
    Plaintiffs,

v.

AQUAFORTIS ASSOCIATES,
LLC & RICHARD SMITH
    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**JUDGMENT**

Trial was conducted in this matter on December 21 & 22, 2018 on the Plaintiffs'

claim for nuisance. The Plaintiffs have proven at trial that the drop in water level of Clary

Lake was the result of the condition of the dam owned by Pleasant Pond Mill, LLC

("PPM"). The drop in the water level in the lake, beginning in 2011 and continuing until

the time of trial, caused an interference with the Plaintiffs use and enjoyment of their

property to such an extent that they have established all of the necessary elements of

nuisance. The court is also satisfied that the Plaintiffs have established damages in the

amount of $50,000, based on the credible testimony of Plaintiff Cheryl Ayer and

Appraiser Stanley Paton.

If PPM were still a defendant in this action, the court would have no difficulty

entering judgment for $50,000 in compensatory damages and moving on to determine if

any amount of punitive damages would be appropriate.

However, PPM is no longer a defendant in this action. Instead the Plaintiffs seek

judgment against Aquafortis Associates, LLC ("Aquafortis") and Richard Smith. The

Plaintiffs argue that the operations of PPM and Aquafortis have been so intertwined that

1

Aquafortis is effectively an "alter-ego" for PPM and should be held liable for damages caused by PPM.

Because "corporations are separate legal entities with limited liability . . . . courts are generally reluctant to disregard the legal entity and will cautiously do so only when necessary to promote justice." *Johnson v. Exclusive Props. Unlimited*, 1998 ME 244, ¶ 5, 720 A.2d 568 (quoting *Anderson v. Kennebec River Pulp & Paper Co.*, 433 A.2d 752, 756 n.5 (Me. 1981)). Despite this, courts may pierce the corporate veil and disregard the corporate entity when equity demands it, such as "when [the entity has been] used to cover fraud or illegality, or to justify a wrong." *Johnson*, 1998 ME 244, ¶ 5, 720 A.2d 568.

To pierce the corporate veil, a plaintiff must show both: "(1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence."[1] *Id.* ¶ 6. The Law Court has not adopted specific factors that must be considered or found in order to determine whether the defendant abused the privilege of a separate corporate identity, but it has cited with approval twelve factors that the Massachusetts courts use. Those factors are:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity[,] assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.

*Id.* ¶ 7 (citing *The George Hyman Constr. Co. v. Gateman*, 16 F. Supp. 2d 129, 149-50 (D. Mass. 1998). A finding of fraud or illegality is not required for the court to determine that an

---

[1] This standard is regularly used for LLCs as well. *See Town of Leb. v. E. Lebanon Auto Sales LLC*, 2011 ME 78, ¶ 8, 25 A.3d 950 (applying the two-prong test to determine whether the veil of a LLC may be pierced).

unjust or inequitable result would occur if the court recognized the separate corporate existence of the LLC. *See Johnson*, 1998 ME 244, ¶ 8, 720 A.2d 568.

The Law Court has not directly addressed this issue of when one corporation or LLC may be held liable for the actions of another. However, it has been considered in other states and, relying upon authority from other jurisdictions, the Superior Court considered when one corporation can be held liable for another corporation's employee's negligence in *Masi v. Keeley Crane Services & Keeley Construction Co.*, No. CV-08-303, 2011 Me. Super. LEXIS 38, (Mar. 18, 2011). There, Nick Masi, who owned Masi Builders, had contracted Keeley Crane to provide a crane and operator for part of its building project. *Id.* at *3. During the work, Nick Masi was injured and the plaintiffs claimed that his injuries stemmed from the negligent operation of the crane. *Id.* Plaintiffs brought suit against both Keeley Crane Service and Keeley Construction Company and moved for partial summary judgment declaring that the companies "were operated as though they were a single enterprise without material regard to their separate corporate existences." *Id.* Therefore, the plaintiffs argued "[t]hey should thus be liable in equity as a unitary business and the sole employer of [the crane operator]." *Id.*

The undisputed facts showed that the companies were listed as separate corporations with Maine's Secretary of State and that both were wholly owned by James Keeley, who was also the president of both companies. *Id.* at *3-4. James Keeley was paid only by Keeley Construction. *Id.* at *4. The companies shared the same mailing address and were housed at the same location. *Id.* Keeley Construction paid seventy-five percent of the rent. *Id.* As he saw fit, James Keeley had the authority to change the amount of rent and wages each company paid. *Id.* At one time, Keeley Construction filed a statement of intention to do business under the name Keeley Crane Service, before it was formed as a separate entity. *Id.* Both companies shared the same Federal Employer

3

Identification Number. *Id.* Keeley authorized the Construction company to guaranty loans taken by the Crane company and the Construction company had acted as the Crane company's guarantor. *Id.* Both companies were covered by the same workers' compensation insurance policy, but by different general liability policies. *Id.* n.2. The Crane company earned $6 million in business per year and had forty employees, while the Construction company earned $2 million in business per year and had six employees. Despite this, the Crane company had a general liability policy of $1 million, but the Construction company had a policy of $2 million, with an additional $3 million umbrella insurance policy that included the Crane company's underlying Employers' Liability coverage. *Id.* at *6-7.

The Crane company had no separate employee handbook, policies, or forms but instead used the Construction company's materials. *Id.* A person employed by the Construction company managed payroll for both operations. *Id.* James Keeley would freely move employees back and forth between the Crane and Construction companies by way of promotion, demotion, or otherwise. *Id.* Employees' paychecks reflected whether they were being paid by the Crane company or the Construction company. *Id.* Although the crane operator applied for employment on forms that bore the Construction company's name, he was officially employed by the Crane company. *Id.* The crane operator reported to James Keeley's son, Ben, who worked for both companies, but was only paid by the Construction company. *Id.*

Plaintiffs argued that "Keeley Crane and Keeley Construction's separate corporate personalities ha[d] merged so that one corporation [was] a mere adjunct of the other or the two companies form[ed] a single enterprise." *Id.* at *8-9 (citations omitted). The Plaintiffs relied on the "alter ego" doctrine enunciated by the California courts that

4

allowed them to apply "classic veil-piercing principles to sister corporations rather than shareholders." *Id.* at *11.

The Superior Court (York County, *Brennan, J.*) quoted the California Court of Appeal as explaining that:

> [u]sually, a disregard of the corporate entity is sought in order to fasten liability upon individual stockholders. . . . However, only a difference in wording is used in stating the same concept where the entity sought to be held liable is another corporation instead of an individual. . . .
>
> Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. . . . 'In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it.'

*Id.* at *11-12 (quoting *Las Palmas Assocs. v. Las Palmas Ctr. Assocs,* 235 Cal. App. 3d, 1220, 1249 (Cal. Ct. App. 1991).[2]

In applying this authority, the Superior Court determined that a unity of interest and ownership that leads to an inequitable result is required to pierce the veil to reach a sister corporation. *Masi* at *12. The court explained that "[a]pplying the principles of veil piercing to sister corporations is not unique to California, nor is it a particularly recent development," as New York courts have discussed the issue as far back as 1966. *Id.* at *12-13 (citing *Walkovszky v. Carlton,* 18 N.Y. 2d 414 (N.Y. 1966)).

---

[2] The relevant portions of *Las Palmas* are contained in Section IV, pages 1248-52 of the decision. The *Las Palmas* court also recognized "[a] very numerous and growing class of cases wherein the corporate entity is disregarded . . . [because] it is so organized and controlled, and its affairs are so conducted, as to make it merely an *instrumentality, agency, conduit, or adjunct of another corporation.*" 235 Cal. App. at 1249.

Finally, in its analysis of the sister-corporation veil piercing doctrine, the Superior Court analyzed the doctrine alongside Maine's current two-pronged veil piercing test and concluded that:

> [n]othing in Maine's articulation of the law restricts its application to suits against a shareholder or parent corporation. The consequences of a decision to 'disregard the corporate entity' are broad and could lead the court to find that two supposedly independent corporations are in fact a single enterprise subject to liability.

*Id.* at *12-13.

The Superior Court then discussed how the facts of the case aligned with the Massachusetts factors cited with approval by the Law Court in *Johnson.* Despite finding that common ownership, pervasive control, and confused intermingling of business activity were present and "blur[red] the line between the entities' business practices," the plaintiffs had not shown a "gross disregard for the corporate form per se." *Id.* at *15-16. The plaintiffs had not shown that James Keeley had used either corporation for his personal affairs, or that either corporation was insolvent. *Id.* at *16. Ultimately, the court held that there were material facts in dispute due to the disparities in the insurance policies for the companies, "coupled with the pervasive intermingling of business and personnel between the companies." *Id.* at *17.

Though *Masi* is not binding authority, this court finds it persuasive and is convinced that the Law Court would recognize the authority of the court to hold one corporation or LLC responsible for the liabilities of another by applying the principles of veil piercing to sister corporations.

In this case, the record is replete with evidence to support a finding that the corporate veil of Aquafortis can be pierced to hold Defendant Smith liable for the actions of Aquafortis. Defendant Smith has abused the privilege of the separate corporate identity. Aquafortis had no separate bank account from its founding in 2010 until June

6

2013. While this matter was pending in 2017 and 2018, Defendant Smith routinely used Aquafortis' accounts to pay for his personal expenses, including buying himself breakfast and lunch, paying for car repairs and parts for his personal vehicle, and paying his dentist and chiropractor. The court does not find credible Defendant Smith's attempts to make business justifications for these expenses of an obviously personal nature. In addition, under the facts of this case, an unjust or inequitable result would occur if Defendant Smith received the protection of the corporate veil.

However, the evidence presented at trial does not convince the court that PPM and Aquafortis should be treated as one entity. Though the interests and activities of the two LLCs have often been aligned and overlapping, these actions are not so pervasive that they formed one enterprise. It is not unusual for LLCs to share interests, addresses, lawyers, or even members. While such facts may support a finding that entities should be treated as one, they are not determinative.

Most significant to the court in this case is that since the founding of Aquafortis, Richard Smith was the single member of the LLC and since 2010, he has not been a member of PPM.[3] In addition, while the court assigns little credibility to most of Defendant Smith's testimony, his explanation for why the property relevant to this matter was separated into different LLCs in 2010 is reasonable. It is clear from the evidence that by 2010, the grand plans for redevelopment of the properties was at a standstill. However, in 2010, the dam had not failed so the court does not reach the conclusion that the reorganization was intended to shield the possibly valuable real estate from the liabilities associated with the dam. Ultimately, the court is not convinced that it would

---

[3] The court is aware of and has considered the evidence contrary to this finding of fact.

7

be equitable to hold Defendant Smith liable for damages caused by a dam he did not own or control.

The most troubling evidence the court heard in this case is that the dam in question has been repaired, after a seven year delay and protracted litigation, at a cost of only $30,000. It is tragic that the time and effort that was spent on an unsuccessful fight against the DEP Water Level Order was not instead focused on finding resources to repair the dam.

Judgment is entered for the Defendants. Due to the prior sanctions order entered by the court, no costs will be awarded to any party.

Any motions not previously addressed by the court are now MOOT.

The Clerk is directed to incorporate this Order by reference into the docket for this case, pursuant to Rule 79(a), Maine Rules of Civil Procedure.

Dated: February 22, 2019

JUSTICE, MAINE SUPERIOR COURT